Charles S. Guggenheimer v. Commissioner.
Guggenheimer v. Commissioner
Docket No. 111821.
United States Tax Court
1943 Tax Ct. Memo LEXIS 106; 2 T.C.M. (CCH) 814; T.C.M. (RIA) 43432; September 22, 1943
*106 Edgar J. Goodrich, Esq., 716 Investment Bldg., Washington, D.C., for the petitioner. Carl A. Phillipps, Esq., for the respondent. STERNHAGEN Memorandum Findings of Fact and Opinion The Commissioner determined a deficiency of $1,257.42 in 1939 income tax based upon the adjustment of several items, of which not all are in controversy. The taxpayer contests (1) the disallowance of deductions taken by a partnership of which he was a member consisting of expenses of operation and maintenance and of depreciation of a house, the reason given for the determination being that they were not connected with a trade or business, and of the deduction of an assessment by the city for the construction of jetties; (2) the disallowance of a deduction taken for dpreciation upon another house owned by the taxpayer individually, and (3) the disallowance of loss on corporate shares on the stated ground that they had become worthless prior to the taxable year. Findings of Fact The petitioner, a practicing lawyer, resides in New York City. His individual income tax return for 1939 was filed in the Second District of New York. The petitioner, his brother, and his sister were the sole partners in a "Joint *107 Account" which filed a partnership return for the year 1939 in the Second District of New York. This Joint Account, designated as Estate of Eliza Guggenheimer, began in 1930 upon completion of the administration of the estate of petitioner's mother who died in 1927. Its assets consisted of the property of the mother which was inherited by petitioner, his brother and his sister in one-third shares. The assets included (1) a one-half interest in a seashore residential property in West End, New Jersey, known as the "Drexel Cottage", and (2) a city residence at 923 Fifth Avenue, New York City. 1. The "Drexel Cottage" is a frame house containing about twenty rooms and is about eighty years old. A seawall or bulkhead along the length of the lot was installed and has been maintained by the owners. The property was purchased in 1900 by petitioner's mother and his married sister jointly and equally. During 1939, it was owned jointly by the sister and the Joint Account and the then undivided interests were: petitioner, one-sixth; his brother, one-sixth; his sister, two-thirds. The owners have always been willing and anxious to rent it. Petitioner and his family have occupied it as a summer *108 home. Neither petitioner's brother nor his sister ever occupied it. The brother and his family have their home within a half block. Petitioner paid $2,500 for his occupancy of the property in 1939, of which $1,250 went to the Joint Account and $1,250 to his sister. This $1,250 of the Joint Account was reported as partnership income. During that year the Joint Account expended, and claimed deductions for, the following amounts in connection with this property: Caretaker's wages
$ 695.00
Repairs
664.61
Depreciation
398.25
Other deductions
129.22
$1,887.08
In 1939, the Joint Account paid $231.33 assessments levied against this property by the City of Long Branch, New Jersey, for the construction of jetties along the coast, one of which abuts on the property dividing the bathing beach and making it less enjoyable. These jetties are built of metal and large rocks and extend about 300 feet from the shore into the ocean. They are designed to protect the shore and bulkheads from the destructive action of the ocean, and they "save the property from being washed away". Neither the partnership nor petitioner controlled their location or erection. The foregoing amounts of $1,887.08 *109 and $231.33, totaling $2,118.41, and offset by the $1,250 reported as income from this property, constituted $868.41 of the ordinary net loss claimed by the Joint Account of which petitioner's one-third share was $289.47. 2. During 1939, petitioner was sole owner of the 923 Fifth Avenue, New York City property, a house of brick and stone with a white marble exterior, which was built about 1898 at a cost of $202,177.87. The lot was 100 feet deep and had a 28 foot frontage. Upon his father's death, the property was inherited by petitioner's mother; and on her death in 1927, by petitioner, his brother and his sister, in equal undivided parts. It became part of the assets of the Joint Account until May 1, 1937, when petitioner purchased the interests of his brother and sister. The price was $225,000 for the whole property and the promise that, if it were sold for more than $200,000, petitioner would give his brother and his sister each one-third of the excess after deducting the amount of his expenses or improvements. No definite allocation of value was made at the time between the house and land. The property was apraised at his mother's death at its assessed value of $325,000. The *110 value of the building alone in 1927 was $155,000, and this was the basis used and recognized for depreciation from 1927 to 1937. Between 1927 and 1937, the neighborhood changed from private homes to apartment buildings. After acquiring the entire property, petitioner remodeled it into apartments and rented them. The house was placed under the management of a real estate organization. 3. The MacLevan Realty Corporation was organized in 1925, and was engaged in buying and selling real estate in Manhattan and the Bronx, mostly old buildings which it renovated and resold. Petitioner invested $15,000 in its preferred shares and $30 in its common. The Joint Account invested $5,000 in its preferred and $10 in its common. The corporation first encountered financial difficulty in 1932 when two of its properties were foreclosed and the mortgagee obtained a $35,000 deficiency judgment against it. Rents from all its other properties were then assigned to this judgment creditor. In 1935, some of its other properties went into default but enough was obtained from them to settle the deficiency judgment for about $700. In 1935, it still held title to two other parcels, one subject to an $8,000 mortgage, *111 the other to a $6,000 mortgage. The secretary and treasurer of the corporation estimated the approximate normal value of these properties above the mortgages as between $3,000 and $4,000. They had a total cost basis of $7,000. The corporation continued to hold title to them in the hope of selling them. In 1939, they were transferred to the mortgagee for an unnamed consideration; the corporation was dissolved December 29, 1939, and a small liquidating distribution was made to the shareholders. The corporation's tax returns for the fiscal years ending October 31, 1934, to October 31, 1939, show no gross income from real estate operations and no deductions. The 1939 return listed capital assets consisting of land and buildings at $14,008.72 with liabilities on notes and mortgages of $26,000 and "Other liabilities" of $40. December 21, 1932, petitioner sold at public auction for $38.29 his 150 shares of preferred stock in this corporation which he had purchased for $15,000 in 1925, and claimed a loss thereon in 1932 return of $14,961.71, which loss was allowed. At the time of the dissolution of the MacLevan Realty Corporation in 1939, petitioner was the owner of 30 shares of its common *112 stock which cost him $30 and he claimed a deduction for long-term capital loss of $15 in his individual return for 1939, which loss was disallowed. The Joint Account at that time held 10 shares of preferred and 50 shares of common which cost it $5,010 on which it claimed a long-term capital loss of $2,505 in its 1939 return, which was disallowed. Petitioner's share of the loss so claimed, based on his one-third interest in the Joint Account, was $835, making his total loss on the stock $850. Opinion STERNHAGEN, Judge: 1. The controversy as to the $1,887.08 paid by the partnership known as the Joint Account turns upon the question whether the amounts, which were unquestionably expended as shown in the findings, were paid in the production of income or for the management, conservation or maintenance of property held for the production of income, and thus deductible as provided in the 1942 statute, section 121. It cannot be said that they were. The property was originally a residence, and has continued to be so. Petitioner alone has occupied it and it has never been rented to anyone else. So far as the evidence shows, no effort has been made so to rent it, although petitioner says *113 that real estate dealers in the community have been aware that the owners were willing to rent it. This is not sufficient to demonstrate that the property was held in the course of trade or business or for the production of income, and the fact that petitioner as an individual occupant paid rent to his partnership which was divided equally between the partnership and the co-owner, his sister, does not change that result. There was no overt act indicating that the production of income was the reason for holding the property. The regulations covering Section 121 of the 1942 Act expressly provide: Sec. 19.23(a)-15. Ordinary and necessary expenses in connection with the management. conservation, or maintenance of property used as a residence by the taxpayer or acquired by him for such use are not deductible, even though the taxpayer makes efforts to sell the property at a profit or to convert it to income-producing purposes, and even though the property is not occupied by the taxpayer as a residence unless prior to the time that such expenses are incurred the property has been rented or otherwise appropriated to income-producing purposes by some affirmative act and has not been reconverted. *114 (Regulations 103, as amended by T.D. 5196, approved December 8, 1942.) This regulation clearly excludes the items in question from the statutory deduction, for the property was used by petitioner as a residence and nothing else, and the meagre and casual efforts, if they can be recognized as such, shown by the evidence, are not sufficient to give it a business character or show that it was held for the production of income. Cf. Mary Laughlin Robinson, 2 TC 305. The Commissioner's disallowance of the deduction of the four items aggregating $1,887.08 in determining the partnership income is sustained, carrying with it the proportionate effect upon petitioner's individual income. The Commissioner also disallowed the deduction by the partnership of the assessments paid by it for the construction of the jetties, one of which abutted the Drexel property. The statute, section 23(c), provides for the deductibility of taxes generally but expressly excepts "(4) taxes assessed against local benefits of a kind tending to increase the value of the property assessed". The construction of the jetties was a local benefit which protected *115 the shore properties from the destructive effect of the ocean and thus maintained the value of the property. Although they did not increase the dollar value of the property they protected it from decrease resulting from ocean damage. This, in our opinion, is the meaning intended by the statutory prohibition. Caldwell Milling Co., 3 B.T.A. 1232; Belfast Investment Co., 17 B.T.A. 213, 229; cf. Thomas H. Thatcher, 45 B.T.A. 64. The disallowance is sustained. 2. The Commissioner reduced a deduction of $3,875 taken by the taxpayer for depreciation on the house at 923 Fifth Avenue, New York, to $2,779.21 by disallowing $1,095.71, and said only that the deduction taken was excessive. The taxpayer used a rate of 2 1/2 per cent upon the base of $155,000, which, it is agreed, was the value of the building at the time of the mother's death in 1927. This had been used as the depreciation base for the deduction by the Joint Account during the entire period of its ownership until 1937, when petitioner became the sole owner by purchase of the interests of his brother and sister. Thus, the taxpayer's *116 ownership of the depreciable property has two separate sources and two separate periods, namely one-third by inheritance from his mother in 1927, and two-thirds by purchase from his sister and brother in 1937, at a cost of $225.000 for both land and building without allocation. There is no question between the parties as to the correctness of continuing, as to the inherited one-third interest, the annual depreciation upon the basis of $155,000 for the whole. The dispute is as to the basis for the two-thirds interest in the building purchased in 1937. Simply stated, the Commissioner used a value for the building in 1937 of $85,000, and the taxpayer has introduced the opinion of a real estate dealer to show that the value in fact was $140,000, of which two-thirds is $93,333.34. This is an allocation between land and building of $85,000 land and $140,000 building, exactly the reverse of the allocation adopted by the Commissioner. It cannot be found from the evidence that the value of the building in 1937 was greater than the Commissioner has determined it to be, $85,000. The witness who gave an opinion did not by his reasoning on the witness stand demonstrate that his opinion was, of *117 itself, authoritative enough to require adoption, and it was not supported by data leading to his conclusion of value. Indeed the evidence does not support any assured determination of the allocated value of the building, and is therefore inadequate to require or permit a finding of value different from what the Commissioner has used as the basis of the deficiency. The petitioner did not assail the rate of depreciation in the petition, and the Commissioner insists that it is not in issue and hence not subject to change in this proceeding. This is true, and we make no findings as to the useful life or the rate. But it is not amiss to say that the opinion of the witness as to the useful life is no more forceful than his opinion as to the value, and would therefore not justify a change in the rate used in determining the deficiency. 3. The Commissioner disallowed a deduction for a long-term capital loss of $850 on account of the alleged worthlessness of the MacLevan Realty Corporation shares, and held that the shares became worthless in an earlier year. The taxpayer contends that the corporation was dissolved in the taxable year and that the shares thereupon became worthless. Thus the *118 issue turns upon the tenuous question as to the precise year when the unquestionable worthlessness of the shares became manifest. The evidence shows that until 1939 the corporation owned property, although its liabilities exceeded its assets, and that when it was dissolved in 1939 it did, in some unaccountable way, make a distribution to the shareholders. This, we think, is enough to show that the shares were not worthless before 1939, and the deduction taken by the Joint Account and by the taxpayer individually should not have been disallowed. The determination on this point is reversed. Decision will be entered under Rule 50.